UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| Cartograf, S.A. de C.V. | § § § | |
| *Plaintiff*, | § § | CIV. NO. _____ |
| v. | § § | |
| Titus Cargo LLC, | § § | **JURY TRIAL REQUESTED** |
| *Defendant*. | § § | |

**ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF**

Plaintiff Cartograf, S.A. de C.V. ("Cartograf") files this Original Complaint against Defendant Titus Cargo LLC ("Titus" or "Defendant"), asserting claims against it for breach of contract, conversion, and fraud, and requesting injunctive relief.

There is an ongoing national health crisis. Cartograf is asking this Court for injunctive relief and a hearing. Defendant is unlawfully holding USD $400,000 in property owned by Cartograf in a warehouse and attempting to extort a payment of USD $120,000 to release the materials. Defendant is being evicted from the warehouse where Cartograf's property is held. If Defendant moves Cartograf's materials when it is evicted, it is likely that the materials will be sold to third-parties. Cartograf will lose long-term clients and business, which cannot be adequately quantified, especially in this dire economic climate. Cartograf therefore asks this Court—because of Defendant's pending eviction and the irreparable loss that will occur—to order a hearing via electronic means and to issue an order protecting Cartograf's property, as detailed below.

**INTRODUCTION**

1. Cartograf is a highly-respected family business that has been operating in North America for decades. Cartograf's business involves purchasing cardboard and paper materials

from vendors in the United States and transporting the materials to Mexico, where they are turned into packaging, such as boxes for consumer products. The packaging is then purchased by Cartograf's customers, many of which make products that are household names throughout the United States.

2. Defendant Titus is a start-up company that was created by Ruben Martinez in May 2019. Martinez wanted to create a shipping and warehousing company that he could run from his estate in Mexico, but he had no customers. In August and September 2019 he wrote letters to Cartograf offering to lease his newly renovated but unused warehouse space in Laredo, Texas, as a storage space for Cartograf's materials, before they would be shipped to Mexico. Martinez described the warehouse as secure to the point that it gave Defendant "absolute control of the merchandize entrusted to us." In January 2020, Titus upped the ante, sending Cartograf a more attractive quote for the cost of its transport and storage services. Cartograf agreed to hire Defendant for transportation and warehousing and placed orders for materials from vendors in the United States on pre-paid consignment. Defendant transported those materials to its Laredo warehouse, from which it had agreed to deliver the materials to Cartograf in Mexico

3. But shortly after Defendant collected and stored Cartograf's materials in the Laredo warehouse, it attempted to unilaterally "renegotiate" the parties' agreement. In what amounts to an extortion scheme, Defendant demanded a payment of more than $120,000 to release Cartograf's materials from the warehouse. Cartograf has since learned that Defendant's owner and "CEO," Martinez, has a reputation for extortion and fraud of a similar nature.

4. Based on representations from Defendant's counsel, Defendant has been served with a notice of eviction from the warehouse. Defendant must leave the premises, requiring removal Cartograf's goods and materials, by April 30, 2020.

5. Defendant, before cutting off all communications, implied it would sell the materials rather than return them to Cartograf. This would, result in significant and irreparable harm to Cartograf. This harm includes (i) financial losses of more than $400,000 (the value of the materials in Defendant's warehouse space), and (ii) the loss of long-term customers whose orders were not fulfilled, which would result in untold additional damage to Cartograf's business.[1]

6. Given the April 30 deadline for Defendant to vacate the warehouse, Defendant's demand of $120,000 in exchange for releasing Cartograf's materials, Defendant's threats that it will sell the materials, and the added time and expense that Cartograf would incur if it had to re-order materials for its customers (and the concomitant delay related to attempting to reorder because of the national health crisis), Cartograf's potential harm is imminent and irreparable. Cartograf is therefore requesting that this Court grant it equitable relief by (1) requiring Defendant to allow Cartograf employees to inspect the materials in the warehouse to ensure that they are still there and in an acceptable condition, and (2) ordering Defendant to permit Cartograf to remove the materials it owns from the warehouse to another secure location.

**PARTIES**

7. Plaintiff Cartograf, S.A. de C.V. is a Mexican company headquartered in Mexico and doing business in Texas and throughout the United States. Cartograf can be served with process through its attorney of record, Eric J. Cassidy, and Curtis, Mallet-Prevost, Colt & Mosle LLP, 2 Houston Center, 909 Fanning Street, Suite 3800, Houston, Texas.

---

[1] Even if Titus is not attempting to fraudulently extort Cartograf (it appears it is), Titus's claims are nothing more than a classic buyer's remorse: they went to Cartograf, an established family business, and apparently offered under-market pricing terms that Titus now cannot honor. Titus wants to renege on the deal because it took a risk and miscalculated. Defendant is now unlawfully holding Cartograf's property for ransom.

8. Defendant Titus Cargo LLC is a Texas domestic limited liability company headquartered in McAllen, Texas. Titus can be served through its agent for service of process on file with the Texas Secretary of State, Mr. Jaime Aranda, 4900 W. Expressway 83, Ste. 253, McAllen, Texas 789501.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this matter pursuant to Article 3, §2, cl. 1 of the U.S. Constitution, and 28 U.S.C. §1332(a)(2), because the parties are a Mexican corporation and a U.S. corporation, and the amount in controversy is in excess of $400,000.

10. This Court has personal jurisdiction over Defendant Titus in accordance with due process because it was incorporated under the laws of Texas and has its principal place of business in McAllen, Texas.

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1), because Titus is a resident of McAllen, Texas.

12. Venue is also proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events occurred in this district. For example Titus sent solicitations, pricing quotes, and invoices to Plaintiff from its headquarters in McAllen, Texas. Plaintiff also communicated with Titus employees located in McAllen, Texas, and received e-mails from servers located in McAllen, Texas. The majority of Cartograf's business communications and negotiations were directed to Titus in McAllen, Texas.

**FACTS**

13. Cartograf is a widely respected company in the business of purchasing raw materials to manufacture packaging for well-known companies in the United States and Mexico. A family business established in 1986, Cartograf has worked to develop ongoing relationships

with its customers, and has a reputation for providing quality materials in a timely manner and at competitive prices.

14. Defendant is a startup company that was created in May 2019. Prior to that, Cartograf had done limited business in 2019 with Defendant's affiliated Mexican company. The owner of both entities, Ruben Martinez, hoped to capitalize on his initial business in Mexico with Cartograf and his contacts with the Laredo and McAllen Chambers of Commerce to convince Cartograf to enter into business in the United States. Martinez lives in a tony residential neighborhood in Aguascalientes, Mexico.

15. On August 20, 2019, Martinez, in his capacity as Defendant's CEO, sent Cartograf a letter (the "August 2019 Solicitation Letter") soliciting its business and providing a quote for basic warehousing services,. The pricing for unloading, storage, and loading were unremarkable and standard for the Laredo storage and warehousing market. To make the prospect more appealing, Defendant promised to perform all invoicing, thus purportedly exempting Cartograf from VAT. Martinez, in the letter, thanked Cartograf to "considering this project." He ended the letter by stating that Defendant was "hoping to be benefited by your approval." Ex. 1.

16. Cartograf told Defendant it would consider the proposal in the August 2019 Solicitation Letter.

17. One month later, on September 19, 2019, Defendant sent Cartograf a second letter (the "September 2019 Solicitation Letter" and, with the August 2019 Solicitation Letter, the "Solicitation Letters") asking Cartograf to rent space in its newly renovated warehouse. *See* Ex. 2. Defendant stated that the reason for the letter was "to put our warehouse … at your disposal." Defendant said that its "team" would give Cartograf "the advantage of having access to a renovated and efficient storage facility." Defendant touted the warehouse's "sophisticated" equipment in the

newly renovated storage facility. *Id*. Defendant further represented that the warehouse facility had "sophisticated" technology and security, which allowed Defendant "total control" of warehoused merchandise. *Id*. Martinez, who signed the letter, concluded by saying the "warehouse is the perfect ally for you to establish as a point of distribution" to reach Cartograf's customers in the United States and Canada. *Id*.

18. Cartograf indicated it was interested in the proposal stated in the September 2019 Solicitation Letter.

19. Defendant's two Solicitation Letters establish that, as of September 19, 2019: (i) Defendant represented that it had rented and built out the Laredo warehouse with "sophisticated" and presumably expensive technology and security equipment prior to any agreement for warehousing with Cartograf; (ii) Defendant was attempting to induce Cartograf into an agreement that did not refer to any requirements related to the volume of material warehoused or shipped; and (iii) there was no contract yet formed between Defendant and Cartograf for storage or warehousing services.

20. In January 2020, Defendant sent Cartograf a quote (the "January 2020 Quote" or "Quote") for shipping and transport services, again soliciting Cartograf to hire Defendant for its transportation needs. *See* Ex. 3. In the January 2020 Quote, Defendant proposed the following terms: Defendant would transport Cartograf's reels at a rate of $150 per unit, which included loading and unloading fees, and, Defendant would provide Cartograf with 15 days of free storage and 15 days of paid storage per month at a rate of $50 per reel. *Id*. The Quote did not mention any volume requirements, and it contained no terms outlining a "discount" or "volume discount."

21. Further, there is no statement, as of January 2020, of any alleged nonpayment of invoices or other alleged issues. To the contrary, the January Quote was a solicitation, sent by a

start-up company to induce Cartograf to agree to send it business for its newly-renovated warehouse and recently-created cargo company.

22. On the basis of the terms in the Quote, Cartograf agreed in mid-January 2020 to hire Defendant. There is no other formal written contract between the parties. Instead, Cartograf agreed to hire Defendant on a job-by-job basis, as reflected in invoices and payments exchanged between the parties starting in late 2020.

23. Under the agreement, Defendant would transport Cartograf's materials from Washington and Louisiana to Laredo, Texas, warehouse them in Laredo, and then transport them to Mexico. The price for each transaction is stated in the invoices received by Cartograf. The agreement was on a shipment-by-shipment basis, as reflected in the invoices.

24. Documents reflect that after receiving Defendant's quote, Cartograf began purchasing materials, specifically uncoated liner board used to create packaging from vendors in the United States. Ex. 4. Cartograf purchased hundreds of thousands of pounds of uncoated liner board on prepaid consignment. Cartograf estimates that the value of the materials it purchased—which are now held hostage by Defendant—is approximately $400,000.

25. Cartograf first realized there was an issue in mid-March, when Defendant became increasing noncommunicative. Throughout this time, Cartograf continued to request that Defendant ship the materials stored at the warehouse to its facilities and customers in Mexico. Despite Cartograf's repeated requests, Defendant became increasingly erratic in its communications and refused to return telephone calls or reply to email communications.

26. In the first few weeks of March 2020, although Laredo's residents were generally aware of the looming crisis caused by the novel coronavirus, they were under no municipal or state orders to stop doing business.

27. During this period, Cartograf could not meet the needs of its third-party customers. As a result, it lost short-term business and is at great risk of losing clients on a long-term basis.

28. On March 23, 2020, Defendant sent a letter to Cartograf (the "March 2020 Letter" or "Letter") addressed to "To Whom It May Concern." The Letter makes several unfounded claims. For example, it alleges—less than two months after Cartograf first agreed to start doing business with Defendant in the U.S.—that Cartograf had not produced the "volume [of materials] agreed upon" by the parties. Ex. 5. The Letter generally asserts that Cartograf failed to make payments to Defendants, but provides no reference to specific invoices that are allegedly unpaid. At the same time, it purports—unilaterally—to change its past invoices to Cartograf to reflect an alleged "full price" for its services. *Id*. It says that, "[s]hortly, you will receive the updated account statement, without nothing further at the moment." *Id*.

29. The March 2020 Letter further claims that Defendant had "reserved" its warehouse for Cartograf "since September of the previous year." But Defendant's Solicitation Letters to Cartograf show that it continued to solicit Cartograf's business until January 2020. No contract was formed between the parties until January 2020 at the earliest, nor had Cartograf provided any written reservation of the space.

30. The March 2020 Letter also blames Cartograf for "enormous losses." *Id*. But what those losses were, or how Cartograf could have caused Defendant such losses in the time between January and March, remains a mystery.

31. The Letter is not signed by Martinez, but instead by Defendant's "Board of Directors." *Id*. None of the names of these individuals are listed and there is no signature.

32. The claims in Defendant's March 2020 Letter are dubious at best. Until the time it received the Letter, Cartograf had made the required payments on invoices Defendant had sent.

*See* Ex. 6. The payments related to the parties' agreement were made between late January through March 2020 total in excess of USD $65,000. In each of the last three invoices Defendant had previously sent, Defendant requested payment for "rental services of transport containers" at unit prices of $855.00. Ex. 7. The unremarkable invoices are for small dollar amounts and contain no reference to unpaid invoices, outstanding balances, or late accounts receivable.

33. In response to Defendant's March 2020 Letter, Cartograf continued to attempt to communicate with Defendant, which either would not respond, or would simply repeat its demand for payment in excess of $120,000 (with no contract, backup, or supporting documentation).

34. Defendant never sent an "updated account statement." It never provided a written list of its "full prices" for services. It has never identified the individuals on its Board of Directors. It has never provided a written contract of any kind (because there is none). Indeed, Defendant effectively stopped communicating with Cartograf after it sent the March 2020 Letter, and has refused to respond to Cartograf's e-mails or telephone calls in any substantive way.

35. When it became clear that Defendant would not meaningfully respond to Cartograf's requests, Cartograf contacted the Laredo Police Department and filed a police report. The Laredo Police Department attempted to enter the warehouse on the last day before Laredo began enforcing the city's "stay at home" order on March 24, 2020. The police could not gain entry to the warehouse to confirm that Cartograf's materials were still being stored at the facility because Defendants had no employees on site and would not answer the office telephone.

36. Cartograf, through its contacts in Mexico, subsequently learned that Defendant's "CEO," Ruben Martinez, has a history of unsavory and fraudulent business dealings. In light of this information and Defendant's conduct with respect to Cartograf, it is clear that Defendant's demand for $120,000.00 is a nothing more than a scheme to extort money from Cartograf while

using the Coronavirus as an excuse to withhold the materials, in order to force Plaintiff to pay money it does not owe.

37. Adding additional urgency to an already critical situation, during the week of March 30, 2020, counsel for Defendant represented that Defendant has now been served with an eviction notice for nonpayment of rent at the Laredo warehouse. Defendant, which presumably continues to hold Cartograf's materials at the warehouse (assuming it has not already dispensed with them), now has until April 30 to vacate the premise and remove all goods currently being stored there—including Cartograf's materials valued at approximately USD $400,000.

## CLAIMS FOR RELIEF

### First Count: Breach of Contract

38. Cartograf repeats and realleges the facts set forth above as though fully set forth in this section.

39. Defendant solicited and induced Cartograf to enter into a contract for shipping, transportation, and storage of goods and services based on representations made in offers, solicitations, invoices, and a standard course of dealing known to merchants in the trade. Cartograf relied on Defendant's representations on price and willingness to transport materials and goods throughout the United States to Laredo and ultimately to Mexico. Cartograf paid Defendant's invoices and honored its obligations under the parties' agreement. Defendant breached the agreement by refusing to ship Cartograf's materials from Laredo to Cartograf's facilities in Mexico, or even allow Cartograf to inspect its materials at the warehouse in Laredo, to ensure they remained in place and had not been sold to third parties. Defendant's refusal to honor the agreement and ship the material to Cartograf in Mexico is a breach of the parties' agreement and has caused Cartograf damages, including but not limited to the loss of revenue, contracts, and third

party customers.

40. Cartograf requests its attorney fees for Defendant's breach of contract under law and equity, including but not limed to Section 38 of the Texas Civil Practice & Remedies Code.

**Second Count: Conversion**

41. Cartograf repeats and realleges the facts set forth above as though fully set forth in the section.

42. The parties entered into an agreement in which Cartograf would purchase materials, including uncoated liner board, on consignment from vendors in the United States, to be transported by Defendant to Laredo, Texas, stored in Defendant's warehouse there, and then transported to Cartograf in Mexico. Instead, Defendant took control of the materials—which Cartograf owns—from vendors in Washington and Louisiana, transported them to Laredo, Texas, and now is holding them, in breach of the parties' agreement, and refusing Cartograf access to the materials. Cartograf has suffered both actual and exemplary damages because of Defendant's conversion of its goods and materials, among other damages, by being deprived of the materials it needed to fulfill orders from its customers.

**Third Count: Fraud**

43. Cartograf repeats and realleges the facts set forth above as though fully set forth in this section.

44. Defendant has committed fraud and fraud in the inducement under Texas law. Defendant knowingly made material misrepresentations in the pricing and terms laid out in the January Quote in order to induce Cartograf to enter into the contract with Defendant. This enabled Defendant to gain access to the materials to hold as leverage over Cartograf, with the intent to get significantly more money from Cartograf than Cartograf had agreed to pay. Defendant also

knowingly made material misrepresentations to Cartograf regarding its intent to transport Cartograf's materials to Mexico, which it never intended to do, and in the significantly inflated invoices it sent Cartograf, asserting that Cartograf owed it $120,000. Defendant's fraud, fraudulent inducement, and implicit fraud caused Cartograf damages in that Defendant caused Cartograf to lose—temporarily or permanently--$400,000 in materials, and therefore existing and future business from customers that were relying on Cartograf for their product packaging.

**Application for Order for Entry onto Property, Order for the
Return of Plaintiff's Property, and Request for Preliminary Injunction**

45. Defendant is wrongfully holding Cartograf's goods and materials in a warehouse that it designed to be impenetrable and totally under its control. Ex. 2. On information and belief, the owner of the warehouse facility has sent Defendant an eviction notice, ordering Defendant to vacate the warehouse by April 30, 2020. Based on this notice, on Defendant's unresponsiveness, on its unwillingness to allow the Laredo police into the warehouse, and its "CEO," Ruben Martinez's bad reputation, it is highly likely that Defendant will move Cartograf's materials from the property to an unknown location, sell them to a third party, or otherwise dispose of them.

46. Most urgently, Cartograf asks that the Court issue an order requiring Defendant to allow an inspection of the materials at the warehouse to ensure they remain in place and have not been sold. This concern is urgent because of Defendant's refusal to communicate with Cartograf, its refusal to allow the Laredo Police entry to the warehouse, and Defendants impending April 30 eviction. Cartograf needs to ensure that its materials have not *already* been disposed of.

47. Cartograf will also suffer imminent and irreparable injury if Defendant is not ordered to allow Cartograf to take possession of its own property or, in the alternative, enjoined, while this suit is pending, from selling Cartograf's materials or transferring them to an unknown warehouse once Defendant is evicted from its current facility, or from otherwise disposing of or

destroying them. Injury to Cartograf is imminent because of Defendant's April 30 eviction deadline, and because a delay in its access to the materials will cause a delay in each of the next steps in its supply chain. Injury to Cartograf would be irreparable because it needs the ***materials***, not their liquidated value, in order to make the packaging its customers require. Even if it were to receive liquidated damages for the materials in the future, the added costs of re-ordering and re-shipping new materials, and of potential lost orders and lost repeat customers, would be immense. *See, e.g., N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984); *Wilson v. Ill. S. Ry. Co.*, 263 U.S. 574, 576-77 (1924).

48. There is no adequate remedy at law here because if Cartograf cannot deliver its packaging products to its customers, Cartograf will lose not only its existing orders, but the business of those customers on a long-term, repeat basis. The loss of long-term customers cannot be adequately calculated in simple economic damages related to a single transaction. Moreover, a legal remedy is merely illusory when Defendant is being evicted and lacks the financial resources to pay any monetary damages.

49. There is a substantial likelihood that Cartograf will prevail on the merits because the evidence shows that Cartograf holds title on consignment of the goods and materials in dispute, and the contracts between the parties say nothing of alleged "volume discounts" or other supposed terms that would allegedly justify Defendant refusing to allow Cartograf access to $400,000 in goods and materials.

50. The harm faced by Cartograf greatly outweighs the harm that would be sustained by defendant if the preliminary injunction were granted. Cartograf is facing the loss of $400,000 in materials and of long-term customers, which cannot be adequately calculated by damages associated with a single transaction. By contrast, Defendant faces the loss of materials it can do

nothing with except use as leverage against Cartograf in return for extra payment.

51. Issuance of the preliminary equitable relief requested would not adversely affect the public interest. This is a commercial dispute that does not impact the public at large.

52. Cartograf is willing to post a bond in the amount the Court deems appropriate.

53. Cartograf therefore asks the Court to set its application for preliminary equitable relief for hearing at the earliest possible time and, after hearing the request, to issue such relief against Defendant.

### Request for Permanent Injunction

54. Cartograf asks the Court to set its application for injunctive relief for a full trial on the issues in this application and, after trial, to issue a permanent injunction against Titus.

### CONDITIONS PRECEDENT

55. All conditions precedent necessary to the maintenance of this lawsuit have been performed or have occurred.

### DEMAND FOR TRIAL BY JURY

56. Plaintiff requests a trial by jury.

### PRAYER

Plaintiff Cartograf, S.A. de C.V. prays for relief as follows:

(a) For actual damages;

(b) For exemplary damages;

(c) For reasonable and necessary attorney fees;

(d) For costs of court;

(e) For prejudgment and post-judgment interest;

(f) For an order granting Cartograf immediate entry to the Laredo warehouse to confirm the goods and materials in dispute remain in place and fully accounted

for;

(g) For an order instructing defendants to transfer Cartograf's goods and materials to Cartograf within 24 hours to avoid the disruption to the status quo that will occur when Titus is evicted on April 30, 2020;

(h) Or, in the alternative, a preliminary injunction preventing Titus or the warehouse owner from disposing of the materials in any way for the duration of this litigation;

(i) For a permanent injunction;

(j) Enter judgment for Plaintiff; and

(k) For such other and further relief, in law and equity, to which Cartograf is entitled.

April 20, 2020
McAllen, Texas

    Respectfully submitted,

    CURTIS, MALLET-PREVOST,
      COLT & MOSLE LLP

    By: */s/ EJC*
    Eric J. Cassidy
    S. D. Tex. Bar No. 300001
    Tex. State Bar No. 24031807
    2 Houston Center, Suite 3800
    Houston, TX 77010
    Telephone: (713) 331-2456
    Fax: (713) 759-9555
    ecassidy@curtis.com

    ROERIG, OLIVEIRA & FISHER, L.L.P.
    David G. Oliveira
    S. D. Tex. Bar No. 34165
    Tex. State Bar No. 15254675
    506 East Dove Avenue
    McAllen, TX 78504
    Telephone: (956) 393-6300
    Fax: (956) 386-1625
    doliveria@rofllp.com

    **Attorneys for Plaintiff Cartograf, S.A. de C.V.**